Jesse D. SMITH, Appellant,

v.

DISTRICT OF COLUMBIA,
et al., Appellees.

No. 01–CV–1392.

District of Columbia Court of Appeals.

Argued June 19, 2003.
Decided Sept. 8, 2005.

Johnny M. Howard, Washington, DC, for appellant.

Stephen C. Rogers, Volunteer Attorney at the time the brief was filed, with whom Arabella Teal, Interim Corporation Counsel at the time the brief was filed, Charles L. Reischel, Deputy Corporation Counsel at the time the brief was filed, and Donna M. Murasky, Senior Litigation Counsel, for appellees.*

Before WAGNER,** REID, and GLICKMAN, Associate Judges.

REID, Associate Judge:

Appellant Jesse D. Smith filed a lawsuit against the District of Columbia and Metropolitan Police Department Officer Stephen Franchak alleging assault and battery, false arrest, negligence, infliction of emotional distress, and violation of his civil rights under 42 U.S.C. § 1983. At the end of testimony presented by Mr. Smith as plaintiff, the trial court granted the defendants' motion for judgment as a matter of law, primarily because Mr. Smith failed to present expert testimony relating to the reasonableness of Officer Franchak's use of force to break up a fight between Mr.

---

* While this appeal was pending, the title of the District's chief attorney was changed. The Corporation Counsel is now known as the Attorney General for the District of Columbia. *See* Mayor's Order no. 2004–92, 51 D.C. Register 6052 (May 26, 2004). *See also* Office of the Attorney General, Office Order No. 2004–28 (May 27, 2004).

** Judge Wagner was Chief Judge of the court at the time the case was argued. Her status changed to Associate Judge on August 6, 2005.

Smith and another man. Mr. Smith filed a timely appeal. He mainly argues that the trial court improperly granted the defendants' motion for judgment as a matter of law, and asserts that expert testimony was not necessary. We affirm the trial court's judgment with respect to the negligence and infliction of emotional distress claims. However, we reverse the judgment regarding the assault and battery and 42 U.S.C. § 1983 claims, and remand the case to the trial court for a new trial on those claims.[1]

## FACTUAL SUMMARY

The record shows that on September 9, 1999, Mr. Smith filed his complaint against appellees in the trial court seeking compensatory and punitive damages. The basis of his complaint was an incident that occurred on September 10, 1998, in front of a residential building in the 1700 block of Seventh Street, in the Northwest quadrant of the District of Columbia.[2] The incident began with a fight between Mr. Smith and David Petty in front of the residential building, to which the police were called to break up the fight. Mr. Smith alleged in paragraphs 9 through 12 of his complaint that "Officer Franchak ... applied a choke hold to [his] throat, temporarily cutting off his air supply and causing him extreme alarm"; that the officer "applied more pressure around the plaintiff's throat and raised his arm and fractured plaintiff's jaw bilaterally"; that Mr. Smith "began to bleed profusely from the mouth and appeared to be in distress and in need of medical attention"; and that "[i]nstead of ensuring that plaintiff received medical attention, defendant Officer Franchak placed handcuffs on plaintiff,

threw him on the ground face down and then dragged him over the pavement by pulling on the handcuffs."

The trial court's April 6, 2001 pretrial order, designed to guide the conduct of the trial, incorporated "the parties' Joint Pretrial Statement." The Joint Pretrial Statement, which was filed on March 28, 2001, set forth the parties' view of the trial. It summarized the "nature of the case." Mr. Smith described the nature of the case, in part, as follows: "This is a lawsuit for negligence, assault and battery, excessive use of police force, infliction of emotional distress, and violations of Plaintiff's civil rights under 42 U.S.C. § 1983." Mr. Smith asserted, in addition: "Officer Stephen Franchak ... applied an illegal choke hold to plaintiff's throat and then fractured plaintiff's jaw bilaterally. Plaintiff was neither arrested [n]or provided with medical care." Plaintiff's statement also described Mr. Smith's permanent injuries and the pain associated with those injuries. The defense attributed Mr. Smith's injuries to his fighting and the punches of Mr. Petty. Under the "claims and defenses" section of the Joint Pretrial statement, Mr. Smith primarily "claim[ed] that he was injured because defendant officer used excessive force while stopping a physical altercation." The defense maintained, in primary part, that Officer Franchak "used reasonable force to prevent plaintiff from fighting" and "did not use an illegal choke hold in violation of D.C.Code § 4–188."

At trial, an oral and maxillofacial surgeon, Dr. Karen Mygil, who was Mr. Smith's treating physician, described the fractures to Mr. Smith's jaw— one on

---

1. Mr. Smith conceded the false arrest claim, but not the circumstances and conduct underlying that claim.

2. Both Mr. Smith's family and Mr. Petty's mother lived in the building.

each side of the jaw.[3] On cross-examination, Dr. Mygil was asked whether Mr. Smith had any "bruising to the neck area ... [a]side from swelling." The doctor responded that photographs taken of Mr. Smith "showed bruising to the neck and sternum."[4] Dr. Mygil, a dental surgeon who was not called as an expert witness, had no knowledge or experience with injuries resulting from choke holds. On cross-examination Dr. Mygil stated that Mr. Smith's injuries were consistent with "blunt force trauma" such as a punch or a fall to the ground, but that choking someone was not consistent with such trauma. She was asked on redirect examination whether she had read or seen "any textbooks or studies that talk about injuries that result from choke holds." She responded: "I have not."

Officer Franchak also was called as a witness by Mr. Smith. At the time of the incident, he was assigned to the Seventh Street area where the altercation between Mr. Petty and Mr. Smith took place. When he arrived on the scene in a police car, Officer Franchak saw Mr. Smith moving toward Mr. Petty and Mr. Petty "kept backing up." Soon, however, Mr. Petty "struck Mr. Smith several times" in the "head and chest or body area." Officer Franchak and his partner, Officer Gregory Kirks, exited their vehicle. As he drew closer to Mr. Smith and Mr. Petty, Officer Franchak noticed that Mr. Petty was "on the ground" and Officer Kirks was on top of Mr. Petty. Mr. Smith "was on top or to the side of Officer Kirks, still trying to strike Mr. Petty."

Officer Franchak pulled Mr. Smith off of Mr. Petty. He described his actions as follows: "I ... ended up grabbing one of [Mr. Smith's] arms and placing it across his face, which would have come across his nose or mouth or eyes area, just across, and pulled him off of [Mr. Petty] like that, still using commands, loud verbal commands to get him to stop." He denied using a choke hold. He testified that "Mr. Smith ... stated he couldn't breathe. Now if someone's talking to you, then that person is breathing. If you're not breathing, then you're not talking." When asked whether he thought "lethal force was necessary" during the September 10, 1998 incident, Officer Franchak responded: "The way this particular situation unfolded, no, this particular situation." Officer Franchak acknowledged that he had placed handcuffs on Mr. Smith and noticed blood on Mr. Smith. He heard Mr. Smith say his jaw was broken. However, Officer Franchak said the comment was made after the ambulance had departed and Mr. Smith had emerged from the residential building "with his mother and said he was going to the hospital." Counsel for Mr. Smith inquired whether Officer Franchak, subsequent to the September 10, 1998 incident and upon seeing Mr. Smith, made a gesture to his jaw to indicate Mr. Smith's discomfort. The officer denied the gesture and asserted that Mr. Smith "curs[ed], rant[ed] and rav[ed] at him."

Mr. Smith called Officer Kirks as a witness. Upon exiting the police vehicle, Officer Kirks "grabbed ... [Mr.] Petty to break up his fight" with Mr. Smith. He did not see how Officer Franchak re-

---

**3.** Dr. Mygil indicated that to treat the fractures, Mr. Smith was placed under general anesthesia, and "titanium metal plates" were rigidly fixed "across the bone fractures to not only ... make sure they're in proper alignment but to fixate them so they are held in place." The plates were secured by screws and a wire or elastic material also was used to hold the jaw. Surgical dressing was wrapped around Mr. Smith's head.

**4.** Plaintiff's exhibits containing pictures of Mr. Smith at the hospital revealed the bruising. They were admitted into evidence.

strained Mr. Smith. He acknowledged seeing a little blood coming from the area of Mr. Smith's mouth. He did not recall hearing Mr. Smith say "he thought Mr. Petty was going to get a gun from the trunk of his car." Nor did he hear Mr. Smith say his jaw was broken.[5] In response to a question about how many times he saw Mr. Petty hit Mr. Smith during the fight, Officer Kirks said "about five ... [a]bout three to the face, a couple to the body." On the subject of whether Mr. Smith stated that Mr. Petty "has a gun," Officer Kirks stated: "Something about that came up, I believe, but I don't recall who said it or what." He thought the trunk of Mr Petty's car was searched, but no gun was found.

Mr. Petty testified about his fight with Mr. Smith; his wife's intervention which landed him on his buttocks, with Mr. Smith on top of him; and the separation of the two men by the police. Mr. Petty said that he had blood on the front and back of his shirt but could not say how the blood got there because he was not bleeding. He noticed the blood when he "got off the ground." He did not see how Officer Franchak restrained Mr. Smith. Mr. Petty admitted that he was aiming for Mr. Smith's face during the fight and "hit him." He agreed that he hit Mr. Smith

hard, and stated that he weighed 182 pounds and reported his height as 5'8". Mr. Petty was asked whether Mr. Smith told him that his [Mr. Smith's] jaw was broken. He replied that when he entered the lobby of the residential building, Mr. Smith said "his jaw was hurting and he just kept spitting blood." Mr. Petty denied "go[ing] to [his] car to retrieve a gun," but stated that he heard Mr. Smith tell the police officers that he, Mr. Petty, had a gun.

Mr. Rahman R. Ali, a longtime friend of Mr. Smith, witnessed the incident that occurred on September 10, 1998. He testified that Officer Franchak "grabbed" Mr. Smith and was "in a yanking, pulling mood." Mr. Smith "put his hands up" and told the officer that he had let go of Mr. Petty "while Officer Franchak was still pulling him." He described how Officer Franchak held Mr. Smith and asserted that the officer had Mr. Smith "like in a choke lock actually."[6] He saw Mr. Smith "spit" blood "on the curb," and heard him tell Officer Franchak, "You broke my jaw." While Mr. Smith was handcuffed, Officer Franchak "grabbed him by the cuffs and kind of like drug him over to the curb...."

Mr. Smith gave testimony. He and Mr. Petty argued about expensive "new shoes"

---

5. Officer Kirks was asked several questions about his training regarding the choke hold. His answers focused on "the sleeper hold" which he considered "basically the same thing" as a choke hold. He believed "the sleeper hold" could be used in a non-lethal situation.

6. Mr. Ali demonstrated how Officer Franchak put his arm ["a]round [Mr. Smith's] neck," but the record does not explain his use of descriptive words such as "like this" or "upon this area up in here" or "like right here." As Mr. Ali put it, Mr. Smith's "head or neck area ... was kind of bent up this way now and he's kind of like off the ground. He's like up in the air like this." The officer's

arm was "[a]round his neck, up in this area, up in here .... His chin probably would have been like right here." Mr. Ali stated:

Like I said, Officer Franchak came and wrapped his arm around [Mr. Smith's] neck and [said], "Let him go, let him go," and like he was—I mean he was literally in the air. He pulled him off—off of [Mr. Petty] out of the air like this and was like, "Let him go," and Mr. Smith put his arms up [and said], "I let him go. I let him go," you know what I'm saying, and Officer Franchak was still pulling him. Then when he let him go, I seen blood coming out Mr. Smith's mouth and he told him, "You broke my jaw."

that his, Mr. Smith's, mother had bought for him. While the argument was in progress and Mr. Petty mentioned a gun, Mr. Smith recalled that in the past, Mr. Petty "pulled [a] gun out on [him], [his] mother and [his] brother and [they were] ... scared." The argument escalated into a fight during which Mr. Petty asked his "girlfriend Monique ... [to] [p]op the trunk" so that he could "get [a] gun." Mr. Smith grabbed Mr. Petty when he saw him "digging in the trunk ... looking for his gun." Mr. Petty's "girlfriend" tried "to break [the men] apart." In the process, Mr. Petty and Mr. Smith "fell" and "tussl[ed] on the ground for like probably 30 seconds and the police officers pulled up." Mr. Smith denied having Mr. Petty in a choke hold. When the two men fell to the ground, one of Mr. Smith's arms was under Mr. Petty and the other arm "was over [Mr. Petty] holding his arms together...." Officer Franchak "grabbed" Mr. Smith and instructed him to let Mr. Petty go. He demonstrated how Officer Franchak restrained him.[7] Mr. Smith "started panicking because [he] couldn't breathe." He told the officer that he had released Mr. Petty. Mr. Smith stated: "My jaw popped and blood started gushing out my mouth onto his arm ...." He said to Officer Franchak: "You just broke my jaw. You just broke my jaw." He was then handcuffed. His mother took him to the hospital to be treated for his injuries because Mr. Smith did not "think [he] could afford [an] ambulance ride."

Mr. Smith detailed his permanent injuries and the screws that were put in his jaw, his symptoms, and the impact of his injuries. For example, he stated that his chin is still and permanently will be numb and that "the bone is pinching the nerve." It feels "like needles." His mouth remained wired for "two-and-a-half to three months." He could only "drink water and ... the broth from soup." It was a painful experience for him. He can't "play with kids" because of a fear that he will be hit accidentally and his jaw will break again. He "jump[s] in his sleep." He "can't play football, basketball, no contact sports." With respect to his post-incident encounters with Officer Franchak, Mr. Smith maintained that the officer would rub his hand over his jaw "trying to be cute or something, being funny about [Mr. Smith's] jaw." In addition, on one occasion, Officer Franchak told him: "I already broke your jaw, so I know you don't want no more." Mr. Smith declared: "If I say something back to him or react a certain way, he's going to lock me up because that's what he wants, ... to make me mad and he'll get to lock me up. So I can't say nothing." Mr. Smith denied cursing Officer Franchak.

In addition to the Howard University Hospital bill for treatment of his injuries, Mr. Smith asked the trial court to admit into evidence the pictures showing his injuries, and a Special Order of the Metropolitan Police Department concerning "Use of Carotid Artery." He also requested the court to take judicial notice of various regulations and statutory provisions.

After the completion of Mr. Smith's case, defendants moved for "judgment as a matter of law."[8] Following rather exten-

7. Mr. Smith stated: "It was like he had my face and stuff right here." While he was being held, Mr. Smith "flipped over ... and [his] neck was still in [Officer Franchak]." While demonstrating, Mr. Smith asserted: "I had him like this and he was like this and I was like, 'I did let him go.'" Neither the trial judge nor counsel offered a narrative to describe the demonstration.

8. As a matter of convenience, the trial court allowed a defense witness, Monique Petty, to testify while the plaintiff's case was still in progress. Mrs. Petty was an eyewitness to

sive discussion with counsel, during which counsel for Mr. Smith voiced disagreement repeatedly with the trial court's analysis, the court granted judgment as a matter of law for all appellees on all counts, stating in principal part:

> [T]he Court believes that the plaintiff in order to survive the claim of 1983 against [Officer] Franchak as well as the excessive force claim, really did need to sponsor some expert testimony on the point here.
>
> Given that there was no per se ban against the type of hold that was used in this case, it is the Court's opinion that the jury would be called upon to speculate that the circumstances here would not be permissible.
>
> They very well would have been permissible and the Court believes that the Plaintiff needed some expert testimony with respect to those two counts.
>
> . . . .
>
> I am saying that the evidence is lacking in supplying this jury with enough information of why it was an illegal hold and that they would be called upon to speculate on that because it's not a per se ban.
>
> The Officer is permitted to use this type of a hold under certain circumstances.
>
> I am saying that Plaintiff has failed to demonstrate to this jury through competent expert testimony of why the Officer's conduct is impermissible under the statute as to those two claims.
>
> . . . .
>
> [I]f you claim that it was the arm to the forehead, then you have not proved that that caused the broken jaw.

> There is no evidence that that caused it.
>
> The only evidence that you have that . . . what caused the broken jaw that you produced is the hold, the choke hold.

With respect to the emotional distress claim, the trial court declared:

> [T]here was positively no evidence from Mr. Smith or anyone else as to the distress that the statements or the movements of the jaw caused him.
>
> There has been no testimony on that point.
>
> There has been testimony of the facial, the hand to the face by [Officer] Franchak. There was testimony of the statement made by [Officer] Franchak. I believe the statement was enough to get you to the jury.
>
> But, there was no testimony as to the distress that Mr. Smith suffered as a result of the statement.

When Mr. Smith's counsel in essence asked for clarification, the trial court said:

> I am talking about the statement.
>
> Your two claims. Your claim for emotional distress was that I broke your jaw once. The implication meaning that I can break it again . . . . and the movement to [Officer] Franchak's face, hand to . . . face when he saw Mr. Smith. Those are your emotional distress claims. Right?

Counsel for Mr. Smith disagreed, eventually saying: "[W]e believe that on the scene, that [Officer Franchak] intentionally inflicted emotional distress upon him by breaking his jaw. After that, in terms of [Officer Franchak] sort of mocking [Mr.

the altercation between Mr. Petty and Mr. Smith. Although some of her testimony was favorable to Mr. Smith, the court did not consider it in ruling on the motion for a directed verdict, but at one point the court mentioned the part of her version of the incident which depicted Mr. Smith as "trying to get to [Mr.] Petty after the police grabbed him."

Smith], we believe that that particular conduct sort of buttressed the fact that [Officer Franchak] intentionally inflicted harm on [Mr. Smith] back in September of 1998." Ultimately the trial court declared: "The Court does believe that once the arrest is conceded, the emotional distress claim at the time of the incident ... fails." Mr. Smith's counsel clarified his statement concerning the false arrest claim.[9] The trial court then stated:

> Basically, my ruling is that now that the arrest has been taken away and the Court's finding that it really is an excessive force case [--]

> It is not an assault and battery in the sense that the officers had no right to touch Mr. Smith. They did.

> They had a right to touch Mr. Smith under those circumstances given that the Court said, the Court is saying that the emotional distress at the scene fails and that the statements later as well as the actions later, the Court would have sent to the jury but for evidence of what actual distress that he suffered as a result of those things.

## ANALYSIS

Mr. Smith contends that the trial court erred by granting appellees' judgment as a matter of law, essentially because it applied incorrect legal principles and misconstrued his case. In particular, he maintains that "[a]n expert witness was not required for jurors to understand whether Officer Franchak was justified in applying a choke hold on [Mr. Smith]." Appellees

support the trial court's judgment. They argue that Mr. Smith's testimony demonstrates that Officer Franchak did not use "a carotid artery hold or any other kind of hold or restraint prohibited or regulated by the Chokehold Act." In addition, they maintain that given Dr. Mygil's testimony, Mr. Smith's injury was consistent with the type of "blunt force trauma" inflicted by Mr. Petty, and "there was no competent evidence from which the jury could reasonably have concluded otherwise." And, appellees contend that "expert testimony was required to show that Officer Franchak's actions in breaking up the fight between [Mr.] Smith and [Mr.] Petty were impermissible under the Chokehold Act or were otherwise excessive or unreasonable, and [Mr.] Smith offered no such testimony."

■■■ In considering whether the trial court erred by granting appellees' motion for judgment as a matter of law, we view the evidence "in the light most favorable to the nonmoving party, who must be given the benefit of all reasonable inferences to be drawn from the evidence." *Sabir v. District of Columbia,* 755 A.2d 449, 452 (D.C.2000) (citing *Abebe v. Benitez,* 667 A.2d 834, 836 (D.C.1995)) (other citations omitted). Judgment as a matter of law "may be granted 'only where the probative facts are undisputed and where reasonable minds can draw but one inference from them.'" *Id.* (citations and internal quotation marks omitted). "Where 'the case turns on controverted facts and the credibility of witnesses, the case is peculiarly

---

9. Early during the discussion of the motion for judgment as a matter of law, the trial court asked whether Mr. Smith "also [had] a false arrest claim." He replied: "We have a false arrest claim and we don't have a false arrest claim." When the court asked for clarification, counsel for Mr. Smith "conced[ed] on the false arrest claim." Later, however, he explained:

> Your Honor, when we talked about conceding the false arrest claim, basically what we are talking about is that the defense to the false arrest which is probable cause would have existed, not the fact that whatever the circumstances were ... we concede how the arrest was ... conducted and the like.

one for the jury.' " *Id.* (citation omitted). In sum, "[u]nder Super. Ct. Civ. R. 50(a)(1), [judgment as a matter of law] is appropriate after 'a party has been fully heard with respect to an issue' provided 'there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue.' " *Bunn v. Urban Shelters & Health Care Sys.*, 672 A.2d 1056, 1059 (D.C.1996).

The court had before it in this case claims of assault and battery (excessive force), infliction of emotional distress, violation of civil rights under 42 U.S.C. § 1983 (Officer Franchak), negligence, and false arrest. The false arrest tort was conceded by appellant, although not the circumstances and conduct relating to the restraining of Mr. Smith. At the time the case was decided, the trial court did not have the benefit of later relevant cases from this court, including *District of Columbia v. Chinn*, 839 A.2d 701 (D.C.2003), and *District of Columbia v. (Felicia) Jackson*, 810 A.2d 388 (D.C.2002). But our decisions in *Sabir, supra,* and *Holder v. District of Columbia*, 700 A.2d 738 (D.C. 1997), were available to the trial court and counsel. The record shows, however, that the court and counsel apparently focused mainly on our decision in *(Anne) Jackson v. District of Columbia*, 412 A.2d 948 (D.C. 1980), a case in which we did not consider claims for false arrest, negligence and false pretenses on the merits because of the doctrine of collateral estoppel. We did focus on the claims of infliction of emotional distress and assault and battery, but determined that there was no battery, and our discussion centered on the alleged assault and the emotional distress allegations, 412 A.2d at 955–57. Thus, the *(Anne) Jackson* case did not involve the merits of the negligence and battery claims, as does the case before us. This is significant because our later cases have pointed to "the perhaps somewhat confus-

ing and overlapping legal principles relating to police use of force" when both negligence and assault and battery claims are presented. *Holder, supra,* 700 A.2d at 742. For this reason, it is important in cases like the one before us to delineate carefully the distinction between an assault and battery tort where there is a claim of excessive police force and a negligence claim involving allegations of excessive police force.

 We took pains to define assault, battery and negligence in *Holder, supra.* We said: "An assault is 'an intentional and unlawful attempt or threat, either by words or acts, to do physical harm to the plaintiff.' " *Id.* at 741 (quoting *Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C.1993)). In contrast, "[a] battery is an intentional act that causes a harmful or offensive bodily contact." *Id.* We also noted that in assault and battery cases, "the outcome of the case [usually] turns on the defense of privilege." *Id.* We explained:

> A police officer has a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not "in excess of those which the actor reasonably believes to be necessary." Moreover, any person, including an officer, is justified in using reasonable force to repel an actual assault, or if he reasonably believes he is in danger of bodily harm. Use of "deadly force," however, is lawful only if the user actually and reasonably believes, at the time such force is used, that he or she (or a third person) is in imminent peril of death or serious bodily harm.

*Id.* (quoting *Etheredge, supra,* 635 A.2d at 916). Thus, the proof requirements for assault and battery in cases involving allegations of excessive force by police officers are not the same as those for negligence cases concerning allegations of excessive

police force. This is so because, "[f]or assault and battery the inquiry is whether the officer's conduct was reasonably necessary and thereby privileged; and for negligence the inquiry is whether the officer's conduct violated the standard of care of a reasonably prudent police officer." *Id.* at 742.

We again emphasized the distinction between such assault and battery and negligence claims in *Sabir, supra,* by declaring:

> [W]hile it is true that one incident may give rise to claims of intentional tort or negligence, these are separate theories of liability which must be presented individually and founded on appropriate evidence. In other words, a plaintiff cannot seek to recover by 'dressing up the substance' of one claim ... in the 'garments' of another....

*Id.* at 452 (citation omitted). To stress the distinction further, we stated: "[I]t is settled that a person cannot negligently commit an intentional tort." *Id.*

In *Chinn, supra,* we once again addressed the confusion surrounding claims of assault and battery and negligence in cases reflecting allegations of excessive police force. We stressed the circumstances under which only the assault and battery claim could be sent to the jury, and those in which both claims could go to the jury:

> While it may be ... that the [police] officers may have mistakenly believed that they needed to exert the amount of force that they did, that does not affect the intentionality of the initial action or the objective excessiveness of the force. An unwanted touching may in its inception be intentional, a battery, or accidental, possibly negligent. But once it is found to be intentional, a battery tortfeasor is liable for the full range of consequences, intended or not, including harm and transferred liability. Therefore, where the excessive force is the product of a battery, an unwanted touching inherent in any arrest, which escalates in an unbroken manner into excessive force, the cause of action is for battery alone, with the privilege having ended at the point where excessive force began. To instruct in such circumstances on a separate and distinct tort of negligence is not only doctrinally unsound but a potential source of jury confusion. It also raises the risk that even where no excessive force is used, the jury will conclude that some undefined negligence was present for which relief of some sort is justified. A battery was committed and the officer is liable unless and only to the extent that the officer is clothed by the privilege.
>
> [I]n certain circumstances the events surrounding the application of excessive force may lend themselves to a theory of negligence as well. What is required to justify such an instruction is at least one distinct element, involving an independent breach of a standard of care beyond that of not using excessive force in making an arrest, which may properly be analyzed and considered by the jury on its own terms apart from the intentional tort of battery and the defense of privilege.

*Id.* at 707 (citation omitted). We further explained that a negligence claim may "fail because the plaintiff does not articulate elements of a negligent action and may not bootstrap from the battery proof alone, as one may not commit a negligent assault." *Id.* at 709 (citing *Sabir, supra,* 755 A.2d at 452 (other citations omitted)). This is so because, "[i]f, in a case involving the intentional use of force by police officers, a negligence count is to be submitted to a jury, that negligence must be distinctly pled and based upon at least one factual scenario that presents an aspect of negligence apart from the use of excessive force

itself and violative of a distinct standard of care." *Id.* Indeed, "[i]t is tautological to speak of the applicable standard of care as being the duty not to use excessive force; that is the precise boundary line of the privilege itself, and it matters not whether it is exceeded because of the deliberate intention of the officer or through a mistake as to the limit of objectively reasonable allowable force." *Id.* Under these circumstances "[a]ny 'negligence' was inherent in the battery itself, which remained a battery but now unprivileged." *Id.* (footnote omitted).

One last point from one of our past cases needs to be made before applying the applicable legal principles to the instant case. That is the question as to whether expert evidence is essential in an assault and battery claim grounded in an allegation of excessive police force. In *(Felicia) Jackson, supra,* we broached but did not squarely decide the issue. We noted:

> The District asserts that the plaintiff's failure to present an expert on standard of care and deviation from it undermined her proof not only of negligence but of assault and battery as well, since in this context each tort "fundamentally involves an inquiry into the reasonableness of the police officer[s'] actions." *Holder,* 700 A.2d at 742. We decline to consider this argument, which has not been briefed by either party and was raised in this court only at oral argument in response to a question from the bench. Whether proof of assault and battery—an intentional tort—based on excessive force requires the *plaintiff* to present expert testimony on the reasonableness of police conduct is a subtle issue, the answer to which might depend, for example, on whether in asserting the "lack of excessive force as a *defense* to assault and battery," *id.* at 744 (emphasis added), the defendant itself has come forward with admissible

expert testimony on the point, something the District failed to do in this case .... We leave the issue for a case in which it has been adequately presented.

*Id.* at 395 n. 15 (citation omitted).

At the outset of the discussion in the case before us on defendants' motion for judgment as a matter of law, defense counsel indicated his belief that the causes of action before the court were: "assault and battery; infliction of emotional distress and the negligent discipline charge." After further discussion, the trial court said: "So, we are dealing with an excessive force issue, negligent training, supervision, discipline ...[; the] 1983 claim [individually against Officer Franchak for violation of Mr. Smith's civil rights]; ... [and] infliction of emotional distress."

■ As the discussion unfolded, neither the court nor the parties focused squarely on the requirements of an assault and battery claim based on the alleged police use of excessive force, and a negligence case involving alleged police use of excessive force, although there were scattered references to "assault and battery" and "negligence." Rather, much of the discussion centered on the doctrine of excessive force, without a battery or a negligence context. But that context is central, since our cases repeatedly have cautioned that there is a meaningful distinction between a battery claim based on police use of excessive force and a negligence claim grounded in police use of excessive force. In short, a battery claim and a negligence claim "are separate theories of liability which must be presented individually and founded on appropriate evidence," *Sabir, supra,* 755 A.2d at 452. Without a constant awareness of these separate theories of liability, as pled by the appellant in his complaint, confusion may result because of the "over-

lapping legal principles relating to police use of force," *Holder, supra,* 700 A.2d at 742, in cases asserting claims of assault, battery, and negligence.

Assault and battery cases turn on "whether the officer's conduct was reasonably necessary and thereby privileged." *Id.* Although the court and parties in the instant case discussed and at times appeared to disagree as to the proper standard of reasonableness, our cases have been clear: " '[T]he reasonableness of a particular act of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20–20 vision of hindsight.' " *Chinn, supra,* 839 A.2d at 706 (quoting *Etheredge, supra,* 635 A.2d at 916) (quoting *Graham v. Connor,* 490 U.S. 386, 396–97, 109 S.Ct. 1865, 104 L.Ed.2d 443) (1989) (footnote omitted). The concept of "privilege" is intertwined with that of "reasonableness: A police officer has a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not 'in excess of those which the actor reasonably believes to be necessary.' " *Id.* (citation omitted). Thus, "[i]f the officer does not use force beyond that which the officer reasonably believes is necessary, given the conditions apparent to the officer at the time of the arrest, he is clothed with privilege. Otherwise, he has no defense to the battery, at least insofar as it involves the use of excessive force." *Id.* And, "[u]se of 'deadly force' ... is lawful only if the user actually and reasonably believes, at the time such force is used, that he or she (or a third person) is in imminent peril of death or serious bodily harm." *Holder, supra,* 700 A.2d at 741 (citation omitted).

Here, at the time the trial court considered the defendants' motion for judgment as a matter of law, the evidence and all reasonable inferences therefrom, "viewed in the light most favorable to [Mr. Smith,] the nonmoving party," *Sabir, supra,* 755 A.2d at 452, established that Officer Franchak intentionally grabbed Mr. Smith. The officer's arm was placed around the neck of Mr. Smith. Officer Franchak held Mr. Smith around the neck with his arm and instructed him to let Mr. Petty go. Mr. Smith testified that he complied with the officer's order but Officer Franchak continued to hold him with his arm. Mr. Smith "started panicking because [he] couldn't breathe." His "jaw popped and blood started gushing out of [his] mouth onto [the] arm [of Officer Franchak]." [10] Mr. Ali, an eyewitness to the incident, testified that Officer Franchak "grabbed" Mr. Smith and was "in a yanking and pulling mood." He described how the officer held Mr. Smith, demonstrating how Officer Franchak put his arm "[a]round [Mr. Smith's] neck." He said that Mr. Smith's "head or neck area ... was kind of bent up ... and he [was] kind of like off the ground." He asserted that the officer had Mr. Smith "like in a choke lock actually," and that even after Mr. Smith put his arms in the air and told the officer that he had released Mr. Petty, Officer Franchak "was still pulling him." Mr. Ali also watched as Mr. Smith "spit" blood "on the curb," and heard Mr. Smith say to the officer: "You broke my jaw." One of the picture exhibits introduced by Mr. Smith showed what appeared to be large drops of blood on the ground. Officer Franchak acknowledged that he heard Mr. Smith say "he couldn't breathe." The officer ignored Mr. Smith and continued to hold him, stating: "If you're not breathing, then you're not talking." In addition, Officer Franchak was asked whether he

---

**10.** The defense theory was that Mr. Smith's jaw was broken either because of blows struck by Mr. Petty, or Mr. Smith's fall to the ground.

thought "lethal force was necessary" during the September 10, 1998, incident, and he replied: "The way this particular situation unfolded, no, this particular situation." Furthermore, Dr. Mygil's testimony established that Mr. Smith's jaw was fractured on both sides of his face. The doctor referenced photographs, introduced at trial, "show[ing] bruising to the neck and sternum" [upper chest area]. This testimony from Mr. Smith, Mr. Ali, Officer Franchak, and Dr. Mygil, as well as the documentary evidence was sufficient to establish an unwanted touching or a battery by Officer Franchak because his contact with Mr. Smith was both "harmful" and "offensive." *See Holder* and *Chinn, supra.*

The remaining question as to the battery claim is whether there was sufficient evidence that the offensive harmful touching was not reasonable and privileged. We have not resolved the question of burden of proof as to reasonableness and privilege in an assault and battery claim, and whether expert evidence as to reasonableness of the police conduct must be introduced by the plaintiff, *(Felicia) Jackson, supra,* 810 A.2d at 395 n. 15. We have noted, however, that this is "a subtle issue, the answer to which might depend, for example, on whether in asserting the 'lack of excessive force as a *defense* to assault and battery,' ... the defendant itself has come forward with admissible testimony on the point ...." *Id.* Here, the record shows that neither party filed a Super. Ct. Civ. R. 26(b)(4) statement regarding expert witnesses; hence, nothing

indicates that the defense planned to introduce expert testimony on the reasonableness of Officer Franchak's use of force to restrain Mr. Smith. Significantly, however, to support his claim of assault and battery Mr. Smith relied, in part, upon statutory provisions, a Special Order of the Metropolitan Police Department, and the testimony of Officer Franchak to prove the officer's excessive use of force that was not privileged. Officer Franchak testified that lethal force was not required in the particular situation he faced with Mr. Smith. D.C.Code § 5–125.01 (2001), formerly D.C.Code § 4–188 (1994), specifies in part: "The Council of the District of Columbia finds and declares that the use of restraints generally known as chokeholds by law enforcement officers constitutes the use of lethal force, and that the unrestricted use of force presents an unnecessary danger to the public." D.C.Code § 5–125.03(a) (2001), formerly § 4–190(a), provides in pertinent part: "The use of the trachea hold by any police officer shall be prohibited under any circumstances and the carotid artery hold shall be prohibited except under those circumstances and conditions under which the use of lethal force is necessary to protect the life of a civilian or a law enforcement officer, and has been effected to control or subdue an individual ...." D.C.Code § 5–125.02(1) and (2) (2001), formerly § 4–189(1) and (2), define a trachea hold (or arm bar hold or bar-arm hold) and a carotid artery hold.[11] And,

11. D.C.Code § 5–125.02 (2001) provides:
 For the purposes of this subchapter, the term:
 (1) A "trachea hold," "arm bar hold," or "bar-arm hold" means any weaponless technique or any technique using the officer's arm, a long or short police baton, or a flashlight or other firm object that attempts to control or disable a person by applying force or pressure against the trachea, wind-pipe, or the frontal area of the neck with the purpose or intent of controlling a person's movement or rendering a person unconscious by blocking the passage of air through the windpipe.
 (2) A "carotid artery hold," "sleeper hold," or "v hold" means any weaponless technique which is applied in an effort to control or disable a person by applying pressure or force to the carotid artery or the

MPD Special Order, "Use of Carotid Artery Hold," Series 93, No. 25, November 19, 1993, which includes pictures of trachea and carotid artery holds, implements these statutory provisions which are part of the District of Columbia Limitation on the Use of the Chokehold Act of 1985.

 Having considered the record before us and the applicable law and legal principles, we hold that, in this case, where (1) Mr. Smith introduced testimony and documentary evidence pertinent to the reasonableness of police use of force in restraining him; and (2) applicable standards governing police restraint of an individual have been articulated in statutes and regulations, and introduced as evidence at trial, Mr. Smith was not required to present expert testimony in order to avoid judgment for defendants as a matter of law. On the record before us, then, and viewing the evidence in the light most favorable to appellant and giving him the benefit of all reasonable inferences, we conclude that judgment as a matter of law on Mr. Smith's battery claim was improper since expert testimony was not required, and Mr. Smith presented a "legally sufficient evidentiary basis for a reasonable jury to have found for [him] with respect to [his battery claim]." Super. Ct. Civ. R. 50(a)(1); *Sabir, supra,* 755 A.2d at 452.

 Mr. Smith's negligence claim also was based on police use of excessive force. Therefore, we confront the question whether it, too, should have been submitted to the jury where Mr. Smith's theory was that Officer Franchak's use of excessive force resulted from the District's failure to properly train, supervise and discipline police officers. *Chinn, supra,* provides an answer to this inquiry:

[I]f, in a case involving the intentional use of force by police officers, a negligence count is to be submitted to a jury, that negligence must be distinctly pled *and based upon at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself and violative of a distinct standard of care.*

*Id.* at 711 (emphasis added). Mr. Smith referenced D.C.Code § 5-123.02 (2001), formerly D.C.Code § 4-176 (1994), but we discounted the use of that statute as "an aspect of negligence apart from the use of excessive force." *Chinn, supra,* 839 A.2d at 711. *Id.* We said:

It is true that in perhaps somewhat unguarded language, we have suggested that a negligence action can be based on the provision of D.C.Code § 4-176 .... Chinn and ultimately the trial court relied upon § 4-176 as setting a standard of care permitting the submission of a negligence count to the jury, and statements in our prior cases provided some support for such reliance. In the absence of any independent grounds for finding negligence, the jury may have speculated that if it determined that the officers acted in the mistaken belief that the amount of force they were using was reasonable, the proper verdict was to hold in favor of negligence rather than battery. But we cannot know this, and other misconceptions that would undercut application of the privilege may have flowed from the inclusion of negligence considerations, especially since the instruction did not expressly confine the jury to the statute in determining negligence.

*Id.* at 712. Consequently, in *Chinn,* "we vacate[d] the judgment appealed from re-

---

jugular vein or the sides of the neck with the intent or purpose of controlling a person's movement or rendering a person un-

conscious by constricting the flow of blood to and from the brain.

mand[ed] the case for a new trial on the assault and battery count alone." *Id.* (footnote omitted). In the case before us, we see no other independent basis on which Mr. Smith relies, since § 4–176 (1994) cannot provide that basis. Equally fatal to his negligence count, Mr. Smith introduced no expert testimony pertaining to the standard of care. Yet as we have stated before:

> In order to prevail in a negligence action, the plaintiff must prove "the applicable standard of care, a deviation from that standard of care by the defendant, and a causal relationship between that deviation and the plaintiff's injury." *Etheredge, supra,* 635 A.2d at 917. Because the applicable standard of care in cases of this kind is beyond the ken of the average lay juror expert testimony is required.

*Holder, supra,* 700 A.2d at 741. Thus, because Mr. Smith did not present a basis independent of excessive force to support his negligence count, and because he failed to introduce expert testimony as to the applicable standard of care, the trial court properly directed a verdict in favor of the defendants on his negligence claim.

 We turn now to Mr. Smith's claim under 42 U.S.C. § 1983.[12] He agreed that this claim lies only against Officer Franchak. His complaint refers to "42 U.S.C. §§ 1983 and 1988, and the Fourth, Fifth and Eighth Amendments to the Constitution of the United States," and his section of the joint pretrial statement alleges "violations of Plaintiff's civil rights under 42 U.S.C. § 1983." During consideration of defendants' motion for judgment as a matter of law, the trial court asked: "What is the 1983 violation? Is it the choke hold itself?" Counsel for Mr. Smith responded: "Your Honor, it's a combination of applying the choke hold in the circumstances where non-lethal force was required and in the actual breaking of my client's jaw." In light of our analysis of the evidence supporting Mr. Smith's battery claim, and our decision in *Sabir, supra,* which involved a § 1983 claim for use of excessive force, we hold that the trial court improperly granted appellees' motion for judgment as a matter of law regarding Mr. Smith's § 1983 claim.

 Finally, we address Mr. Smith's infliction of emotional distress claim. The trial court granted the motion for a directed verdict on this claim because it concluded that (1) "once the arrest is conceded, the emotional distress claim at the time of the incident ... fails," and (2) there was no "testimony of the distress that Mr. Smith suffered as a result of the action of [Officer Franchak's] rubbing of [his] face and the comments" he made in the aftermath of the September 10th incident. It appears that the trial court misapprehended Mr. Smith's infliction of emotional distress claim. That claim revolved around the circumstances under which Officer Franchak restrained appellant and the Officer's continued use of force after Mr. Smith released Mr. Petty, to the point of breaking his jaw and causing pain and permanent injury, as well as the impact of the broken jaw on his activities. The action of Officer Franchak rubbing his face

12. In *Gross v. District of Columbia,* 734 A.2d 1077 (D.C.1999), we noted that "42 U.S.C. § 1983 establishes a cause of action against any person who 'under color of any statute, ordinance, regulation, custom, or usage' of any state or the District of Columbia deprives another person of 'any rights, privileges, or immunities secured by the Constitution and laws.'" *Id.* at 1083 n. 13. We also said in *Sabir, supra,* "'The law now ... is that the official must intentionally, or with reckless disregard, violate a clearly established right before a § 1983 claim is justified.'" *Id.* at 454 (quoting *District of Columbia v. Evans,* 644 A.2d 1008, 1017 (D.C.1994) (other citation omitted)).

and his comment concerning the breaking of Mr. Smith's jaw ("I already broke your jaw, so I know you don't want no more") were designed to show intent to harm on the part of Officer Franchak, as well as Mr. Smith's fear that if he said anything to Officer Franchak, he would be "lock[ed] up."

To establish infliction of emotional distress, "a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) either intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C.2002) (citing *Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C.1984) (other citation omitted)). "The conduct must be 'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (citing *Homan v. Goyal*, 711 A.2d 812, 818 (D.C.1998)) (other citation omitted). The ultimate question is whether "the recitation of the facts to an average member of the community would arouse his [or her] resentment against the actor, and lead him [or her] to exclaim 'Outrageous!'" *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 46 (1965)).

Mr. Smith's brief does not address the elements of an infliction of emotional distress claim, and hence, does not highlight the conduct of Officer Franchak which allegedly was "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized society." *Homan, supra*, 711 A.2d at 818. And, our review of the record in this case does not permit us to conclude that "the recitation of the facts [in this case] to an average member of the community would arouse his [or her] resentment against [Officer Franchak] and

lead him [or her] to exclaim 'Outrageous!'" *Larijani, supra*, 791 A.2d at 44. Consequently, the trial court's judgment as a matter of law regarding the infliction of emotional distress claim was proper.

Accordingly, based on the foregoing reasons, we affirm the trial court's order granting judgment as a matter of law on Mr. Smith's negligence and infliction of emotional distress claims. However, we reverse the trial court's judgment as to Mr. Smith's claims of battery and violation of 42 U.S.C. § 1983, and remand the case to the trial court for a new trial on those claims.

*So ordered.*

GLICKMAN, J., Associate Judge, concurring:

I differ with my colleagues about the assault and battery claim in this case, but in the end I am constrained to agree—for narrower reasons than my colleagues adopt—that the jury should have been allowed to consider it. If appellant merely had presented evidence that Officer Franchak used a carotid artery "choke hold" to subdue him (as he struggled violently with David Petty and Officer Kirks), breaking his jaw in the process, I would vote to affirm the trial court's award of judgment to the defendants as a matter of law. Police use of such a choke hold to subdue appellant was not *per se* illegal or excessive, but rather was permissible if it was "necessary to protect the life of a civilian or a law enforcement officer." *See* D.C.Code § 5–125.03(a) (2001). To get to the jury, appellant therefore would have been obliged at a minimum to present expert testimony or other probative evidence that it was not reasonably "necessary" for Officer Franchak to use a choke hold in the circumstances of this case, *i.e.*, that the officer reasonably could have restrained appellant by a different and lesser application of force. (It was undisputed

that appellant ignored repeated police commands to cease fighting before Officer Franchak tried to restrain him physically.) Appellant did not present such evidence, either in testimonial or documentary form.

Appellant did, however, present some evidence—not much, but some—from which I think the jury reasonably could have found that Officer Franchak needlessly continued to use the choke hold on him, and broke his jaw, *after* appellant had stopped struggling and was subdued.[13] An eyewitness, Rahmaan R. Ali, testified that after Officer Franchak put appellant in a "choke lock," "I seen Mr. Smith put his hands up, tell him, 'I let him go,' while Officer Franchak was still pulling him." Elaborating on this statement, Ali testified as follows:

> Like I said, Officer Franchak came and wrapped his arm around his— around his neck and was, "Let him go. let him go," and like he was—I mean he was literally in the air. He pulled him off—off of him out of the air like this and was like, "Let him go," and Mr. Smith put his arms up, "I let him go. I let him go," you know what I'm saying, and Officer Franchak was still pulling him. Then when he let him go, I seen blood coming out Mr. Smith's mouth and he told him, "You broke my jaw."

Appellant himself was rather less clear, but I understand his testimony to be that Officer Franchak continued to choke him and cut off his breathing even after he repeatedly told the officer "I did let him go. I did let him go."[14]

Personally I may think that this testimony (and the critical inference that I suggest a reasonable jury could have drawn from it) was against the great weight of the evidence overall, but the standard for granting judgment as a matter of law in a jury trial is more stringent. *See* Super. Ct. Civ. R. 50(a)(1) (requiring that there be "no legally sufficient evidentiary basis for a reasonable jury to find for" the party on the issue in question); *Sabir v. District of Columbia,* 755 A.2d 449, 452 (D.C.2000) ("[T]he evidence must be viewed in the light most favorable to the nonmoving party, who must be given the benefit of all reasonable inferences to be drawn from the evidence."). Accordingly, on what I take to be a narrower ground, I am compelled to concur with my colleagues' decision that appellant is entitled to a new trial on his assault and battery claim (and, consequently, on his § 1983 claim as well).

13. Regrettably, appellant's counsel failed to call this evidence to the trial court's attention when it considered the defendants' motion for judgment as a matter of law, and instead seemed to agree that the evidence did not exist. Thus, during argument on the motion, the following critical colloquy took place:

> THE COURT: .... Regardless of whose theory that you take in this case, once he is subdued be it through the broken jaw, the fight broke up or whatever, *once they are separated, Franchak stops.*
> [APPELLANT'S COUNSEL]: *Correct.*
[Emphasis added]

14. According to appellant:

> .... [I]t got to the point where I flipped over like this and my neck was still in him,

and he was like, "Let him go. Let him go." I had him like this and he was like this and I was like, "I did let him go." I was kicking because I started panicking because I couldn't breathe. I was like, "I did let him go. I did let him go," because I started getting scared.

My jaw popped and blood started gushing out of my mouth onto his arm, and he was like, "You got AIDS? You got AIDS?" I'm still on the ground and I was like, "No, I ain't got no AIDS," with blood gushing out my mouth. I'm like, "You just broke my jaw. You just broke my jaw." [*Id.* at 231–32]