**George PURCELL, et al., Appellants,**

v.

**Marva E. THOMAS, Appellee.**

**No. 03–CV–1038.**

District of Columbia Court of Appeals.

Argued Sept. 6, 2006.
Decided July 26, 2007.

Karl W. Carter, Jr., with whom Nathaniel Speights, Washington, DC, was on the brief, for appellants.

Johnny M. Howard, Washington, DC, for appellee.

Before REID and FISHER, Associate Judges, and SCHWELB, Senior Judge.

REID, Associate Judge:

Appellants, George Purcell and Fedora, Inc., challenge the judgment of the trial court entered after a jury rendered a verdict in favor of appellee, Marva E. Thomas, on her sexual harassment hostile work environment claim under the District of Columbia Human Rights Act ("DCHRA"), and her intentional infliction of emotional distress claim. They primarily contend that (1) the trial court should have dismissed Ms. Thomas's DCHRA claim on statute of limitations grounds; (2) the trial court improperly instructed the jury on Ms. Thomas's claims and erred by denying their motions for judgment as a matter of law and for a new trial; and (3) Mr. Purcell "cannot be held individually liable under the provisions of the [DCHRA]." Discerning neither error nor abuse of discretion, we affirm the judgment of the trial court.

## FACTUAL SUMMARY

On October 27, 2000, Ms. Thomas filed a complaint against Mr. Purcell and Fedora, Inc. under the District of Columbia Human Rights Act, D.C.Code § 2–1401, *et seq.* (2001). She alleged, in part, that "[Mr.] Purcell terminated [her] employment after she failed to yield to the unwelcome sexually harassing, verbal and physical advances that he repeatedly made toward her." She further complained that "[Mr.] Purcell's sexually discriminatory conduct created a hostile work environment extremely detrimental to [her] emotional and physical health, interfered with [her] work performance, and caused her acute emotional distress necessitating medical treatment and consequent medical expenses." She demanded damages and reasonable attorney's fees. The defendants filed a motion to quash service of process and to dismiss the complaint in February 2001, which motion the trial court denied. Later, they renewed the motion to dismiss for insufficiency of service of process, which the court also denied.

Pre-trial matters were discussed on May 28, 2003, and trial commenced on May 29, 2003. Ms. Thomas presented the following relevant evidence at trial.[1] She was trained in educational psychology, and had work experience in different parts of the country pertaining to neglected, abused and troubled children. She met Mr. Purcell in October 1996, and they discussed a proposal to create a residential/educational facility for troubled and educationally challenged students in the District, which

---

1. Pre-trial and trial proceedings took place over several days, from May 28, 2003 to June 11, 2003. The plaintiff presented ten witnesses and the defense called seven, and the parties offered documentary evidence. We do not mention all of the evidence in our factual summary.

would be modeled upon her past experiences. By late 1996 or early 1997, the Fedora Center was launched. Ms. Thomas and Mr. Purcell had "a verbal agreement" for a partnership, but by July 1997, Mr. Purcell informed Ms. Thomas that he had decided against an ownership interest for her, and she "became a salaried employee." Ms. Thomas was "disappointed" but because of her "sweat equity" in the project and her belief in the concept, she remained at Fedora.

According to Ms. Thomas, Mr. Purcell's inappropriate sexual comments began around early 1998. At first the comments were "very complimentary" ("You're so beautiful," "nice outfit or nice suit"). Then they became a little uncomfortable, with statements about his wife's "wonder bra," an inquiry as to whether Ms. Thomas wore one; his "miss[ing] the scent of a black woman" during lovemaking; the "size of [Ms. Thomas'] ... a* * "; and discussions with his son about how to wear a condom. On one occasion, Mr. Purcell "closed the door" to Ms. Thomas' office, "walk[ed] over toward [her] ... unbuckled his belt ... [and] pulled his pants out to show [her] how much weight he had lost on his stomach."

When Mr. Purcell made what Ms. Thomas thought were inappropriate comments, she would call people whom she trusted to "ask what does this mean." The comments "started really to affect [her]." She "started feeling degraded ... helpless ... [and] really kind of afraid to say anything."

In October 1998, Ms. Thomas' father, who lived in California, became critically ill and she traveled back and forth to California, in order to both be with her father, and to continue to work on matters pertaining to Fedora. Ms. Thomas received "very complimentary" words from Mr. Purcell, and Fedora gave her a bonus in early 1999. When Ms. Thomas thanked Mr. Purcell for the bonus, he said, "yeah, yeah, yeah, you said thank you but what's in it for me? What am I getting out of this?" He also stated that he was "not reaping any of the benefits"; that Ms. Thomas' boyfriend was "getting all goods or stuff," words of "that nature."

In February 1999, Mr. Purcell and Ms. Thomas went to a restaurant to discuss business. A "kind of busty" waitress served them. Mr. Purcell "started telling [Ms. Thomas] about his past experiences making love to women with large breasts and how it was distasteful to him." He said, "you flop them from here flop this way flop 'em that way.... That was enough for him. He didn't like women with large breasts." In March 1999, while Mr. Purcell and Ms. Thomas were discussing "the strategy of the program" at a restaurant, Mr. Purcell called her "a good cookie" and also asked whether he could go to her apartment, which was close to the restaurant. Ms. Thomas said, no. On another occasion in 1999, Mr. Purcell went to Ms. Thomas' office, and he asked her assistant to leave. When he saw some unopened Superior Court envelopes on her desk, he inquired why they were not opened. After Ms. Thomas responded, Mr. Purcell "took his arm and just knocked everything off [her] desk." Ms. Thomas "kneeled down and started crying and saying why are you doing this." Mr. Purcell "kneeled down to pick [her] up and held [her] and said I am sorry, I am so sorry." Ms. Thomas "pushed him away." Mr. Purcell again apologized and left after Ms. Thomas' administrative assistant returned. Ms. Thomas "felt destabilized, ... felt emotionally just shattered."

In May 1999, Ms. Thomas received a call from Mr. Purcell while he was on Pennsylvania Avenue en route to Fedora's office. He stated, "you need to hurry up and get

downstairs. I'll be there in five minutes. We've got a problem. Hurry up. Come downstairs." Ms. Thomas was "frantic," and ran downstairs. Mr. Purcell instructed her to get into his car. She got into his car; the motor was running. Mr. Purcell "shifted the gear from left to right to reverse and he said this is what I want to do to you [to Ms. Thomas]. When was the last time you had a good f* *k anyway? And just started laughing, thought it was funny."

Fedora encountered a problem in August 1999, with respect to payment for certain services (known as "wrap around services") provided to children in its care. The Youth Services Administration ("YSA") requested "sign-in sheets" for each facility, reflecting the services rendered. YSA gave Fedora three days to hand in the sign-in sheets. On the morning of Ms. Thomas' meeting with the YSA contact, she and Mr. Purcell met to discuss the matter. She informed him that "there were some loopholes but ... most [of the sheets] were signed." Ms. Thomas then met with the YSA contact and gave her the sign-in sheets, which turned out to be incomplete. As a result, Fedora's payment invoice was challenged. About a week later, while Ms. Thomas was on vacation with her elementary school son, Mr. Purcell requested a meeting with her at a coffee shop during which he expressed "outrage[ ] at the fact that [Ms. Thomas] allowed [the sign-in sheets] to be given without assuring that they were complete." He blamed her for "a lot of money that [Fedora] lost," became "agitated," and told her to go back to California. Mr. Purcell spoke in a "loud" voice; Ms. Thomas was "crying." About a week later, Mr. Purcell called Ms. Thomas and said: "I just wanted to let you know how much of an asset you have been to this company. How are you doing, Ms. Thomas?" Ms. Thomas was "confused" but "relieved" because Mr.

Purcell "was no longer [the] beast" that he was "the day before." Ms. Thomas returned to work a week later.

Fedora faced the prospect of losing all of the children placed in its care in September 1999, due to Mr. Purcell's decision to employ a strategy of telling the agency to remove all of the children because Fedora had not been given a new purchase service agreement. About that time, Mr. Purcell's wife was facing surgery and he asked to meet with Ms. Thomas so that they could discuss strategy. They met at the Café Deluxe. Mr. Purcell said: "[M]y wife is going to undergo surgery this week. And I'm going to be out of commission for six weeks." He continued, I "need to have sex with somebody I can trust. I can trust you, Ms. Thomas." Ms. Thomas said, "no." As they were leaving the café, Mr. Purcell asked whether Ms. Thomas "was wearing underwear." When Ms. Thomas said, "excuse me," Mr. Purcell asserted, "I feel like doing something freaky." Mr. Purcell "walked away and called [Ms. Thomas] a f* *k* *g amateur." Ms. Thomas spoke with a friend after the incident, and began to look for other work. Ms. Thomas testified that she "was losing [her] confidence" and that she "felt degraded."

Ms. Thomas recounted an incident in 1999, "around the second week of October," after a meeting with businessmen had taken place. Ms. Thomas asked Mr. Purcell, "how do you think the meeting went," and Ms. Thomas observed that one of the men in the room "never looked at me[,] ... never acknowledged that I was even in the room." Mr. Purcell responded, "that's because he thought you were my b* * *h, it's called respect." Ms. Thomas told Mr. Purcell: "I ... really wish you would not talk to me this way. It's really degrading to me. I don't appreciate it." She then "walked out."

Around late October, 1999, Ms. Thomas "was rushed to the hospital" because of a physical ailment. She was given medical treatment and released early the next morning. On the morning of October 27, 28 or 29, 1999, the YSA contact called Ms. Thomas and indicated that she "really need[ed Ms. Thomas'] help" with one of Fedora's clients. When Ms. Thomas explained her need for bed rest because of her hospitalization, the YSA contact "insisted" that Ms. Thomas come in to help her during a meeting with the client's social worker who was convinced that the client was absent from a Fedora facility without leave. Ms. Thomas complied with the social worker's plea, attended the meeting, and was able to provide the social worker with a copy of a court order showing that the client was not absent without leave.

While Ms. Thomas was gathering her belongings in order to return home from the emergency meeting, Mr. Purcell's assistant called to say that Mr. Purcell wanted to see Ms. Thomas in his office. Ms. Thomas explained that she had been in the hospital the previous day, had a leave slip, and asked the assistant to let Mr. Purcell know that she would reschedule the meeting. Mr. Purcell then called Ms. Thomas directly. He was "fuming, angry," and said "what the f* *k do you mean you're not coming to my meeting. You passed one of my f* *k* *g buildings to get to another one of my f* *k* *g buildings and you can't come to my meeting." Ms. Thomas was "stunned" and told Mr. Purcell she was "on sick leave" and had only come in for the meeting with the YSA contact. Mr. Purcell replied: "Ms. Thomas, when I call a meeting you're to be there. Since you didn't come to this meeting you're fired. Get the f* *k out of my building. Take your sh*t, you got one hour to get your sh*t out of my building." Then he "hung up." Ms. Thomas began to

cry and called Mr. Purcell. She asked Mr. Purcell, "what is this about. Why are you firing me, what is this about, is this about sex. Is that what this is about." Mr. Purcell answered, "you know what it's about, you know what this is about, Ms. Thomas," and hung up. Ms. Thomas described herself as "just frantic"; she was "nervous, jittery ..., didn't eat ..., couldn't sleep."

Mr. Purcell called Ms. Thomas "around November 7th or 8th ... [and] said he needed to talk to [her]," needed to give her something. Ms. Thomas thought he wanted to give her her last check. They met at the Café Deluxe on Wisconsin Avenue. Mr. Purcell had "decided ... to ... give [Ms. Thomas] 10 thousand dollars," and to "keep [her] on salary for November and December [1999]." In response to Ms. Thomas's question concerning the reason for the ten thousand dollars, Mr. Purcell characterized it as a "severance" or words to that effect. When they were outside the Café, Mr. Purcell stated, "I can't believe that I had you making all the decisions here in this company and I wa[s]n[']t even getting the sex." Ms. Thomas said "is that what this is really all about, Mr. Purcell?" He replied: "trust me, if I wanted the sex I'd have had it and [he] walked away." Thereafter, Mr. Purcell telephoned Ms. Thomas repeatedly during the month of November to inquire about Ms. Thomas and to inform her that her "next check was there." He declined to mail the check and took the position that Ms. Thomas should "come get" her check or he could "bring" it to her. During one conversation Ms. Thomas asked for a discharge letter, and Mr. Purcell declared: "I told everybody here you're on sick leave." When Ms. Thomas explained that she needed the discharge letter for "unemployment purposes," Mr. Purcell asserted, "that's a couple of months away." Mr.

Purcell continued to call Ms. Thomas in December, but she "didn't pick up."

During her trial testimony, Ms. Thomas discussed her subsequent job search, and her difficulty in finding other employment. She also focused on the difference in pay between the job for which she was hired and her compensation at Fedora. And she outlined her medical expenses related to her therapy sessions.

Lydia Mallet, Ms. Thomas' long-time friend and college classmate, communicated with Ms. Thomas on a regular basis. Ms. Thomas "would call [Dr. Mallet] and tell [her] about something Mr. Purcell had said to her that was sexual in nature, and that was vulgar and [Ms. Thomas] was shocked and amazed and embarrassed and confused." She "was extremely upset" and "didn't know how to handle" the situation when Mr. Purcell made sexual comments to her. On one occasion Ms. Thomas said that "she couldn't sleep, and couldn't eat, she was nervous, nervous about running into [Mr. Purcell], nervous about doing the wrong thing, and nervous about doing something that might set [Mr. Purcell] off after he called [her] from her office and said come meet me downstairs and he took the stick shift of his car and moved it in several different directions and said that is what I want to do to you," and also she was "crying on the phone" after Mr. Purcell "told her she just needed a good f* *k and she would get in line...."

Dr. Mallet stated that Ms. Thomas "was really upset and concerned ..." and "she was nervous, concerned and worried, ... crying." A "couple of weeks before [Ms. Thomas] was fired," and after "Mr. Purcell told [Ms. Thomas] that his wife was going to have surgery and he was going to be out of commission for six weeks or so, and that he wanted to have sex with someone he

could trust." Ms. Thomas said, "no" and Mr. Purcell "got very angry and told her that she was an amateur." Ms. Thomas called Dr. Mallet "within hours [after this incident], as soon as she could get to [her]." Ms. Thomas also "was crying" during her telephone call to Dr. Mallet "right after" Mr. Purcell terminated her and told her "to get her stuff and get the f* *k out of his building...." Subsequently, Dr. Mallet stated, "it went on for months where it was hard for [Ms. Thomas] to get herself together and put her life back together." "[T]here were several times where [Ms. Thomas] would call [Ms. Mallet] and be ... in a low mood or upset or crying or not saying anything, just holding the phone."

Ms. Thomas was referred to Rev. Angelaloyd B. Fenwick, a licensed psychotherapist. Rev. Fenwick met Ms. Thomas in November 1999, and began seeing her in early December 1999, "to help her to deal with anxiety and stress that she was going through," which was related to "her work situation." Rev. Fenwick noticed that Ms. Thomas "was feeling almost in a hopeless situation, especially regarding her employment situation," and Rev. Fenwick's "impression was that [Ms. Thomas] was someone who was experiencing severe depression at that time...." Ms. Thomas "felt like as she looked back on the situation, that many innuendos had been made and inappropriate language said to her," and "she felt ... that she had allowed herself to be berated sexually in terms of some language that was used toward her and she just felt very bad about it." Rev. Fenwick's "impression" was that Ms. Thomas "was experiencing dysthymia ... and anxiety with mixed emotional features." [2]

**2.** Other witnesses testified in behalf of Ms. Thomas. Robert Green, a friend, mentor, coach, and former professor of Ms. Thomas, received several calls from Ms. Thomas dur-

Mr. Purcell's defense theory was that he never made any comments of a sexual nature to Ms. Thomas, and that she was properly terminated from Fedora because of inadequate performance in aspects of her work. The defense theory was presented through several witnesses.[3] The

ing the period 1998 through 1999. Ms. Thomas "was tearful, ... crying," and "[s]he expressed fear of losing her job," after Mr. Purcell made comments about her bra and panties. One or two months before Mr. Purcell fired her, Ms. Thomas called Dr. Green and was "[t]earful, crying, almost sobbing," after a meeting with Mr. Purcell during which he made comments about going to bed with Ms. Thomas and going to her apartment. And, Ms. Thomas was "sad, fearful" after going to pick up a post-termination check and hearing Mr. Purcell talk about "how good she looked" and when he "again asked her for sex," or to be his "housewife, office wife, or something to that effect."

Two other witnesses testified in behalf of Ms. Thomas, LaCrisha Butler and Charren Brooks. Ms. Thomas enlisted the help of LaCrisha Butler, a fellow church member, to pick up her checks following her termination. On the first occasion, Ms. Butler was given the check by an employee. The second time, Mr. Purcell asked to see her and made inquiries about Ms. Thomas, expressing his concern about her. During the course of his conversation with Ms. Butler about Ms. Thomas, Mr. Purcell said that "he had gone to the line but never crossed the line." Charren Brooks, a colleague of Ms. Thomas' at another organization and her roommate for about eighteen months, also picked up a check for Ms. Thomas in Fall 1999. When Mr. Purcell gave the check to Ms. Brooks, he asked about Ms. Thomas, said he was trying to reach her, and inquired as to why she did not return his call.

3. Sandra McPhaul (also known as Sandra Webb), who worked under Ms. Thomas at Fedora and who was married previously to Mr. Purcell's brother, "several times observed [Ms. Thomas] very upset because Mr. Purcell wanted her to produce certain information and she hadn't done it or she didn't have it." and "at the end [of her employment] ... Ms. Thomas completely wasn't doing anything. She was barely even coming to work." Ms. McPhaul claimed that Ms. Thomas made sexually explicit comments about Mr. Purcell and her desire with respect to one of his private parts, and called Mr. Purcell's wife a "b* * *h." Erica Brown of the District's

Youth Services Administration testified that in August 1999, she "requested backup documentation" from Ms. Thomas for Fedora's bills for the children placed with the center, because "her boss felt [that] the bills had gotten excessive...." And, "after about two weeks, the documents still weren't ready because it was a lot of documentation." However, Ms. Thomas eventually called to say that the documents were ready, and Ms. Brown picked up "about four or five boxes worth of documents" from Fedora at "the end of the summer of '99."

Dominic Andrew Zirpoli, then an assistant juvenile prosecutor for the Office of the Corporation Counsel (now the Attorney General, D.C.), worked with YSA. Mr. Zirpoli was concerned about a court order (eventually vacated on appeal) that required the District to pay Fedora for certain services to children who were still under the supervision of Court Social Services. He discussed with Ms. Thomas "how it was that Fedora could be paid for the services that were provided to the youth while they were under the supervision of the court." On one occasion during a court hearing, he became "frustrated" and "said to the Court ... that Ms. Thomas was not a party to the case and had no standing." On another occasion, he objected to payment issues relating to Fedora being raised during a juvenile commitment proceeding. Mr. Zirpoli and Ms. Thomas had a verbal altercation after another hearing when Ms. Thomas accused him of doing something "sneaky." William Taylor Stansberry, a "financial advisor consultant" to Fedora from 1996 through 1999, testified that during certain of his meetings with Mr. Purcell, designed to discuss accounting and other business matters, Ms. Thomas would interrupt to talk about such things as pictures taken at a beach, and her visits to the court and one of the District's agencies. Another witness, Magdalena Aldona Johnson, Mr. Purcell's sister-in-law, served as Mr. Purcell's administrative assistant, sat close to Mr. Purcell's office, and could "hear what was going on inside the office." On cross-examination, however, she was asked, "could you hear what was happening inside [Mr. Purcell's] office?" She replied, "No."

last witness for the defense was Mr. Purcell. Mr. Purcell denied making any of the sexual comments attributed to him by Ms. Thomas and her witnesses. He stated that there were complaints about Ms. Thomas both from Fedora staff and the District, and that Ms. Thomas did not follow his instructions regarding her court appearances. He "placed Ms. Thomas on a thirty-day probation ... two weeks before the date of [her October] termination." The District had conducted an audit of Fedora, and Ms. Thomas had not followed Mr. Purcell's instructions. He asked Ms. Thomas to leave Fedora because "[w]e no longer could afford to continue the kind of downward spiral that our company was going through as a result of Ms. Thomas' behavior. The complaints were too numerous and we were under all kinds of pressure that was of Ms. Thomas's doing."

The jury was presented with four questions on the verdict form, all of which were answered yes, in favor of Ms. Thomas:

1. Do you find by a preponderance of the evidence that defendant Fedora, Inc. sexually discriminated against Marva Thomas?

2. Do you find by a preponderance of the evidence that defendant George Purcell sexually discriminated against Marva Thomas?

3. Do you find by a preponderance of the evidence that Fedora, Inc. intentionally inflicted emotional distress on Marva Thomas?

4. Do you find that defendant George Purcell intentionally inflicted emotional distress on Marva Thomas?

The jury awarded Ms. Thomas damages in the amount of $165,000.00, in response to the verdict form statement: "Please state the amount of damages you award to Marva Thomas." Defendants filed a post-judgment renewed motion for judgment as a matter of law and for a new trial, which the trial court denied. Defendants noted an appeal.

## ANALYSIS

Appellants make several arguments on appeal. Our review of these arguments reveals no reversible trial court error.[4]

---

The defense wanted to present Dr. Robert Yancey as a witness "to testify about the prescription medication that he prescribed for [Ms. Thomas] and [to indicate that Ms. Thomas had] described certain conditions and reasons for requesting [the medication.]," as "the possible alternative cause of [Ms. Thomas'] emotional distress." The trial court declined to permit the testimony on the ground that it was substantive rather than impeachment testimony, and because Dr. Yancey was not on defendants' witness list.

4. We dispose of appellants' service of process argument summarily. They in essence contend that the trial court erred when it failed to dismiss Ms. Thomas' lawsuit for failure to effect service and file proof thereof within sixty days of the filing of her complaint. Ms. Thomas argues, in part, that appellants "waived the right to complain about the service of process after having conceded at the initial scheduling conference that they were satisfied with the timeliness of service." On

December 27, 2000, Ms. Thomas filed a motion to enlarge the time for effecting service of process on appellees, but the motion was one day late. Her motion stated that "[n]umerous attempts were made to serve both [Mr.] Purcell and Fedora, Inc. ..., [that she was] able to contact staff persons employed by [Mr.] Purcell, but [had] not reached him personally." She also indicated that Mr. Purcell would "be away from the office during the holiday season and [would] not return until [the following] week." Service was effected on January 11, 2001, and proof was filed the following day all before an order of dismissal had been filed. On February 8, 2001, appellants moved to quash service of process and to dismiss Ms. Thomas' complaint on the basis of untimely service of the complaint. At a status conference held on February 9, 2001, defense counsel mentioned the motion to quash service, but then said:

[Counsel for Ms. Thomas] explained to me this morning that they, in fact, had submit-

### Statute of Limitations and Jury Instructions

Appellants contend that the trial court erred by not dismissing Ms. Thomas's complaint on statute of limitations grounds because it "does not allege an event within the one year statute of limitations of the District of Columbia Human Rights Act." Ms. Thomas maintains that appellants waived the statute of limitations defense because they failed to timely plead it as an affirmative defense. Appellants also challenge the trial court's jury instructions regarding Ms. Thomas's DCHRA and intentional tort claims. They assert that they were unfairly prejudiced and deprived of a fair trial, in part, because the trial court "failed to instruct the jury adequately on [Ms. Thomas'] burden of proof of liability ..., and further, "failed to instruct the jury on ... the proper two-part analysis for finding extreme and outrageous conduct and the prohibition on recovery for insults, petty oppressions, and other trivialities...." Appellants made substantially the same arguments in their post-verdict renewed motion for judgment on the pleadings and for a new trial.

■■■■ We turn now to the legal principles which govern our analysis. In *Daka v. Breiner*, 711 A.2d 86 (D.C.1998), we

again recognized that a motion for judgment after trial is granted only in " 'extreme' cases." *Id.* at 96 (quoting *Oxendine v. Merrell Dow Pharm., Inc.*, 506 A.2d 1100, 1103 (D.C.1986)). We give deference to the trial court's decision, and "[r]eversal is warranted only if 'no reasonable person, viewing the evidence in the light most favorable to the prevailing party, could reach a verdict in favor of that party.' " *Id.* (quoting *Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 363 (D.C. 1993)) (citations and internal quotation marks omitted); *see also Smith v. District of Columbia*, 882 A.2d 778, 786–87 (D.C. 2005). In addition, "the trial court has broad latitude in passing upon a motion for a new trial," and our review is only for abuse of discretion. *Gebremdhin v. Avis Rent–A–Car Sys., Inc.*, 689 A.2d 1202, 1204 (D.C.1997). The trial court may grant a motion for a new trial if it determines that the verdict is against the weight of the evidence, or that there would be a miscarriage of justice if the verdict is allowed to stand. *Id.* With regard to jury instructions, " '[a] trial court has broad discretion in fashioning appropriate jury instructions, and its refusal to grant a request for a particular instruction is not a ground for reversal if the court's charge,

---

ted a motion for an extension of time but there was no file in the office at the time that I reviewed it before I filed my motion. But, now that I have a copy of that we will file that answer.

Appellants filed an answer on February 9, 2001, but did not raise untimely service of process as an affirmative defense. We conclude that appellants waived the right to assert untimely service of process, by failing to raise this defense when they filed their answer. At any rate, because Super. Ct. Civ. R. 4(m) is "mechanical rather than dispositive," *Wagshal v. Rigler*, 711 A.2d 112, 114 (D.C. 1998) (citation omitted), the trial court did not abuse its discretion in denying both appellants' motion to quash service of process and to dismiss the complaint, and their renewed

motion. The record shows that Ms. Thomas made numerous efforts to serve Mr. Purcell and Fedora, but was unable to do so because Mr. Purcell was out of town for the holiday season. Appellants were served on January 11, 2001, prior to the initial scheduling conference on February 2, 2001, and before the beginning of discovery, and therefore, could not have suffered any prejudice. Nor did defendants allege any prejudice either in their February 6, 2001, "motion to quash service of process and dismiss complaint," or in their "renewed motion to dismiss for insufficiency of service of process and failure to comply with the rules of this court." We discern no error on the part of the trial court. *See Packheiser v. Miller*, 875 A.2d 645 (D.C.2005).

considered as a whole, fairly and accurately states the applicable law.'" *Nelson v. McCreary*, 694 A.2d 897, 901 (D.C.1997) (quoting *Psychiatric Inst. of Washington v. Allen*, 509 A.2d 619, 625 (D.C.1986)). "We read the instructions as a whole, in light of the evidence presented and the law." *Ruffin v. Temple Church of God in Christ, Inc.*, 749 A.2d 719, 721 n. 3 (D.C. 2000) (citations omitted).

▮▮▮ "To prove sex or gender discrimination under the DCHRA, [Ms. Thomas] was required, initially, to 'make a *prima facie* showing of discrimination by a preponderance of the evidence.'" *United Mine Workers of America, Int'l Union v. Moore*, 717 A.2d 332, 338 (D.C.1998) (quoting *Sutherland, supra,* 631 A.2d at 361).[5] "To establish a *prima facie* case of sexual harassment under [the DCHRA], a plaintiff must demonstrate that (1) she is a member of a protected class; (2) she has been subject to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the harassment complained of affected a term, condition, or privilege of employment; (5) respondeat superior." *Howard Univ. v. Best*, 484 A.2d 958, 978 (D.C.1984) (citations omitted). Sexual harassment "must be sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment," and plaintiff must show that "her psychological well-being has been detrimentally affected." *Id.* at 980 (citations omitted). "More than a few isolated incidents must have occurred, and genuinely trivial occurrences will not establish a prima facie case," but "[n]o specific number of incidents, and ·no specific level of egregiousness, can be set forth; nor is the fact that each incident may not be individually actionable determinative." *Id.* "Instead, the trier of fact must consider the totality of the circumstances...." *Id.* (citation omitted). "Conduct need not ... be overtly sexual to contribute to a sexual harassment hostile work environment claim." *Psychiatric Inst. of Washington v. District of Columbia Comm'n on Human Rights*, 871 A.2d 1146, 1151 (D.C. 2005) (citations omitted). "Rather, all adverse conduct is relevant so long as it would not have taken place but for the gender of the alleged victim." *Id.* (citing *Williams v. General Motors*, 187 F.3d 553, 565 (6th Cir.1999)) (other citations omitted).

▮▮▮ In sum, "a plaintiff establishes a prima facie case of sexual harassment upon demonstrating that unwelcome verbal and/or physical advances of a sexual nature were directed at him/her in the workplace, resulting in a hostile or abusive working environment." *Best, supra,* 484 A.2d at 981 (citations omitted). And, "a plaintiff 'has a viable hostile environment claim if [she] can demonstrate (1) that

---

5.  D.C.Code § 2–1402.11(a)(1) (2001), formerly codified at D.C.Code § 1–2512(a)(1) (1999), provides:

    (a) General.—It shall be an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based upon the actual or perceived: race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, family responsibilities, genetic information, disability, matriculation, or political affiliation of any individual:

    (1) By an employer.—To fail or refuse to hire, or to discharge, any individual; or otherwise to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment, including promotion; or to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his status as an employee[.]

[she] is a member of a protected class, (2) that [she] has been subjected to unwelcome harassment, (3) that the harassment was based on membership in the protected class, and (4) that the harassment is severe and pervasive enough to affect a term, condition, or privilege of employment.'" *Daka, Inc. v. McCrae,* 839 A.2d 682, 693 n. 11 (D.C.2003) (quoting *Breiner, supra,* 711 A.2d at 92). "If the employer then satisfies its burden by articulating some legitimate nondiscriminatory reason for [the employer's action], [ ] the burden shifts back to the employee to prove, ... by a preponderance of the evidence, that the employer's stated justification for its action was not its true reason but was in fact merely a pretext to disguise discriminatory practice." *Moore, supra,* 717 A.2d at 338.

▆▆▆▆ With respect to statute of limitations consideration, " '[i]t does not matter ... that some of the component acts of the hostile work environment fall outside the statutory time period.'" *Lively v. Flexible Packaging Ass'n,* 830 A.2d 874, 890 (D.C.2003) (en banc) (quoting *AMTRAK v. Morgan,* 536 U.S. 101, 117, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)). Indeed, "[e]ven if there are significant gaps in the occurrence of acts constituting the hostile work environment claim, the filing of that claim still may be timely because this type of 'unlawful employment practice ... cannot be said to occur on any particular day. It occurs over a series of days or perhaps years.'" *Id.* (quoting *Morgan,* 536 U.S. at 115, 122 S.Ct. 2061). This is so "because a hostile work environment claim concerns a single unlawful practice which is treated as an indivisible whole for purposes of the limitations period, even if an initial portion of that claim accrued outside the limitations period." *Id.* at 892 (footnote omitted); *see also Ledbetter v. Goodyear Tire & Rubber Co., Inc.,* —— U.S. ——, ——, 127 S.Ct. 2162, 2175, 167

L.Ed.2d 982, —— (2007) ("A hostile work environment ... typically comprises a succession of harassing acts, each of which 'may not be actionable on its own'[;] ... the actionable wrong is the environment, not the individual acts that, taken together, create the environment.") (citation and footnote omitted).

▆▆▆▆ "Intentional infliction of emotional distress consists of '(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress.'" *Best, supra,* 484 A.2d at 985 (citation and internal quotation marks omitted). "Intent or recklessness can be inferred from the outrageousness of the acts." *Id.* (citing *Anderson v. Prease,* 445 A.2d 612, 613 (D.C.1982)) (other citation omitted). "The conduct must be so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Smith, supra,* 882 A.2d at 794 (quoting *Homan v. Goyal,* 711 A.2d 812, 818 (D.C.1998)) (other citation and internal quotation marks omitted). "Creation of a hostile work environment by racial or sexual harassment may, upon sufficient evidence, constitute a prima facie case of intentional infliction of emotional distress." *Best, supra,* 484 A.2d at 986 (citation omitted). "The ultimate question is whether the recitation of the facts to an average member of the community would arouse his [or her] resentment against the actor, and lead him [or her] to exclaim 'Outrageous!'" *Id.* (citations and internal quotation marks omitted).

▆▆▆ After applying the applicable legal principles to our examination of the evidence presented and to the trial court's instructions to the jury, we are satisfied that the statute of limitations was not a bar to Ms. Thomas' sexual harassment

hostile work environment claim, and that reasonable jurors could conclude that she presented ample evidence to refute appellants' denial of sexually harassing comments and conduct by Mr. Purcell, and also to rebut the defense of a legitimate nondiscriminatory reason for her termination (unsatisfactory work performance), that is, Ms. Thomas satisfied her ultimate burden to "prove ... by a preponderance of the evidence" that appellants' stated unsatisfactory work performance justification was a pretext to disguise sexual harassment. *Moore, supra,* 717 A.2d at 338. Furthermore, read "as a whole, in light of the evidence presented and the law," *Ruffin, supra,* 749 A.2d at 721, the trial court correctly charged the jury regarding a sexual harassment hostile work environment claim and a claim for intentional infliction of emotional distress, "accurately stat[ing] the applicable law." *McCreary, supra,* 694 A.2d at 901. Contrary to appellants' arguments, the trial court properly instructed the jury on Ms. Thomas' burden to prove liability and the circumstances under which she could not recover damages for a hostile work environment claim and for intentional infliction of emotional distress. The trial court charged the jury, in part, that defendants' "liability clearly does not extend to mere insult or indignities or threats or annoyances or petty omissions or other trivialities," and that their "conduct must be so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency." The court further informed the jury that it must "find by a preponderance of the evidence that the reasons for and/or manner by which Mr. Purcell and Fedora Incorporated terminated and sexually harassed Ms. Thomas involved extreme and outrageous conduct that caused Ms. Thomas severe emotional distress." When the entire record is reviewed, and recognizing that "a hostile work environ-

ment claim concerns a single unlawful practice which is treated as an indivisible whole for purposes of the limitation period, even if an initial portion of that claim accrued outside the limitations period," *Lively, supra,* 830 A.2d at 892, and that "the actionable wrong is the environment, not the individual acts that, taken together, create the environment," *Ledbetter, supra,* 127 S.Ct. at 2175, we are satisfied, as we indicate below, that reasonable jurors could find that Ms. Thomas not only filed a timely claim, but also that she proved, by a preponderance of the evidence, that defendants were liable.

Ms. Thomas' proof established that she is a member of a protected class (women), that Mr. Purcell "subjected [her] to unwelcome harassment ... based on membership in the protected class" (females), and that "the harassment [was] severe and pervasive enough to affect a term, condition, or privilege of employment." *McCrae, supra,* 839 A.2d at 692 n. 11 (quoting *Breiner, supra,* 711 A.2d at 92). If believed by reasonable jurors, "the totality of the circumstances" revealed by Ms. Thomas' trial testimony proved repeated comments and actions by Mr. Purcell, or a series of harassing acts which were "sufficiently pervasive [that they] alter[ed] the conditions of [Ms. Thomas'] employment and create[d] an abusive working environment," which "detrimentally affected" Ms. Thomas' "psychological well-being." *Best, supra,* 484 A.2d at 980. It does not matter that some of the incidents described by Ms. Thomas, such as the early 1998 events, may have been offensive but not actionable by themselves.

Around 1998, Mr. Purcell's comments and actions in the presence of Ms. Thomas had sexual connotations (for example, saying that he missed "the scent of a black woman" during lovemaking; unbuckling his belt and pulling his pants out, report-

edly to demonstrate his loss of weight; and stating that "when his son was at an age where he might be interested in sex[,] ... [he] made him whip it out right in front of [him] and put the condom on right there so [he] knew exactly what [his son] was doing with the condom"). In the face of these actions, Ms. Thomas "started feeling degraded ... helpless ... [and] really kind of afraid to say anything." Mr. Purcell's actions became more bold, grossly disgusting and beyond decency in 1999, and included vivid accounts by him of "his past experiences making love to women with large breasts," and calling and ordering Ms. Thomas to meet him downstairs immediately, to get into his car, whereupon Mr. Purcell shifted the gears in his car, told Ms. Thomas, with laughter: "this is what I want to do to you" and asked, "[w]hen was the last time you had a good f* *k anyway?" In an earlier encounter in her office, Mr. Purcell "took his arm and just knocked everything off [Ms. Thomas'] desk; she rebuffed his efforts to hold her while apologizing. This particular conduct, as well as certain other behavior is relevant because it 'need not ... be overtly sexual to contribute to a sexual harassment hostile work environment claim, ... so long as it would not have taken place but for the gender of [Ms. Thomas].'" *Psychiatric Inst. of Washington, supra,* 871 A.2d at 1151 (citation omitted).

Mr. Purcell continued with his sexual harassment in Fall 1999, telling Ms. Thomas that his wife was scheduled for surgery and that he "need[ed] to have sex with somebody [he could] trust." Even after Ms. Thomas told him "no," Mr. Purcell persisted, asking her whether she "was wearing underwear" and stating that he "fel[t] like doing something freaky." When Ms. Thomas complained that one male ignored her during a business meeting, Mr. Purcell responded, "that's because he thought you were my b* * *h, it's

called respect." Mr. Purcell suddenly fired Ms. Thomas in a fit of anger, cursing at her, at the end of October 1999. Ms. Thomas had left her sick bed following hospitalization, to come into the office on an emergency basis to attend a meeting, and explained, through her assistant, that she was on sick leave and would have to reschedule his requested meeting with her. A few days later, Mr. Purcell decided to "keep [Ms. Thomas] on salary for November and December [1999]," and called Ms. Thomas repeatedly, insisting that she come to the office to pick up her check or he could "bring it to her," all after his comment to Ms. Thomas in early November that he could not "believe that [he] had [her] making all the decisions here in this company and [he] wa[s]n[']t even getting the sex." From this behavior, reasonable jurors could infer that Mr. Purcell still had the intent to pursue Ms. Thomas and to have sex with her by keeping her on the payroll in November and December 1999 and telling others that she was on sick leave; "intent can be inferred from the outrageousness of the acts," *Best, supra,* 484 A.2d at 985.

Ms. Thomas presented proof of the impact on her and her emotional well being of Mr. Purcell's behavior recounted how Mr. Purcell's harassing behavior had had a detrimental effect on her well-being. For example, she felt "degraded," "helpless," "destabilized," "emotionally just shattered," "frantic," "nervous, jittery," and unable to eat or sleep. In addition, other witnesses such as Dr. Mallet and Dr. Green testified about Ms. Thomas' reaction to Mr. Purcell's sexual harassment—her crying, nervousness, worry, and inability to sleep. Ms. Thomas' licensed psychotherapist, Rev. Fenwick, testified about Ms. Thomas' anxiety, hopelessness, and depression which she related to Ms. Thomas' "work situation." In Rev. Fenwick's view,

Ms. Thomas "was experiencing dysthymia . . . and anxiety with mixed emotional features."

From this record, reasonable jurors could find that Ms. Thomas's proof established sexual harassment "severe and pervasive enough to affect a term, condition, or privilege of employment," *McCrae, supra,* 839 A.2d at 693 n. 11, and that appellants created a hostile and abusive work environment. We conclude that the jury's verdict was not based on "merely a few isolated incidents . . . [or] genuinely trivial occurrences." *Best, supra,* 484 A.2d at 986. Indeed, reasonable jurors could find that Mr. Purcell's conduct was "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Smith, supra,* 882 A.2d at 794. Furthermore, an impartial jury could reasonably find that Ms. Thomas' proof "would arouse [the] resentment [of 'the average member of the community'] against [Mr. Purcell] and [would] lead [that member] to exclaim 'Outrageous!'." *Smith, supra,* 882 A.2d at 794. Hence, we cannot say, as the trial court could not, that "no reasonable person, viewing the evidence in the light most favorable to the prevailing party [Ms. Thomas] could reach a decision in [her] favor." *Breiner, supra,* 711 A.2d at 96 (quoting *Arthur Young & Co., supra,* 631 A.2d at 363). Nor can we declare that the trial court abused its discretion in denying appellants' motion for a new trial; appellants do not meet our standard that the verdict must be "against the clear weight of the evidence," or that there would be a miscarriage of justice if the verdict is allowed to stand. *Gebremdhin, supra,* 689 A.2d at 1204.

### Mr. Purcell's Liability as an Individual

Mr. Purcell argues that the trial court erred by not granting him judgment as a matter of law "because he cannot be held individually liable under the provisions of the District of Columbia Human Rights Act." He claims that "[b]ecause . . . a supervisor is not himself the employer, he cannot be held individually liable under the [DCHRA], whose prohibition against employment discrimination is limited to employers." Although recognizing "that individual supervisor liability is permissible under the [DCHRA]," based on our decision in *Wallace v. Skadden Arps, Slate, Meagher & Flom,* 715 A.2d 873, 887–89 (D.C.1998), he points out that *Wallace* "extended a partnership's liability to the individual partners," whereas in this case "plaintiff's employer was . . . a corporation that has a distinct legal personality and thereby shields the individual officers and shareholders like defendant Purcell from liability for its wrongful acts."

As we have seen, the DCHRA makes it an unlawful discriminatory practice for an employer "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, . . . or otherwise adversely affect his [or her] status as an employee." D.C.Code § 2–1402.11(a)(1). We had occasion to consider the definition of "employer" under the DCHRA in *Wallace, supra.* D.C.Code § 2–1401.02(10) (2001), formerly codified at D.C.Code § 1–2502(10) (1999), defines "employer" as

any person who, for compensation, employs an individual, except for the employer's parent, spouse, children or domestic servants, engaged in work in and about the employer's household; any person acting in the interest of such employer, directly or indirectly; and any professional association.

We focused on the definition of "employer" for the purpose of determining "[t]he amenability of [law] partners to suit." We emphasized the last category of the defini-

tion, "any person acting in the interest of such employer, directly or indirectly," and observed that there is no comparable provision in Title VII. *Id.* Nor does Title VII include an aiding and abetting provision as does the DCHRA: "It shall be an unlawful discriminatory practice for any person to aid, abet, invite, compel, or coerce the doing of any of the acts forbidden under the provisions of this chapter [Chapter 14, Human Rights] or to attempt to do so." D.C.Code § 2–1402.62 (2001), formerly codified at D.C.Code § 1–2526 (1999). We relied on these provisions to "support our conclusion that the partner defendants are amenable to suit." *Wallace, supra,* 715 A.2d at 889. Thus, we determined that the phrase " 'any person acting in the interest of such employer, directly or indirectly,' necessarily includes a partner" in a law firm. *Id.* at 888.

■ Here, we are faced not with a question of the individual liability of law partners under the DCHRA, but with an issue involving the individual liability of Mr. Purcell, the President, Chief Operating Officer, controlling shareholder, and Director of Fedora, as well as the supervisor of Ms. Thomas. In his various capacities, Mr. Purcell was acting, directly or indirectly, in the interest of Fedora and hence fell within DCHRA's definition of employer. Consequently, we hold that because Mr. Purcell was a high level official of Fedora who exercised extensive supervisory, management and administrative authority over the corporation, he was individually liable to Ms. Thomas under the DCHRA.

While we have not had an occasion to consider the individual liability of supervisors other than law firm partners under the DCHRA, the United States District Court for the District of Columbia has decided cases in the context of other types of supervisors and has found that supervisors are subject to individual liability. In *Mitchell v. National R.R. Passenger Corp.,* 407 F.Supp.2d 213 (D.D.C.2005), plaintiff sued not only the National Railroad Passenger Corporation, but also two employees, the former Director of the Workforce Development unit in the Human Resources Department of the corporation who had supervised the plaintiff during her employment, and the Vice President of the corporation's Human Resources Department. The court determined that both individuals were "proper defendants in plaintiff's DCHRA claim," because: "The text and purpose of the DCHRA and *Wallace,* do not suggest it would be appropriate to follow Title VII here and preclude a claim against individual management and supervisory employees involved in committing the allegedly discriminatory conduct." *Id.* at 241.[6] Earlier, in *MacIntosh v. Building Owners & Managers Ass'n,* 355 F.Supp.2d 223 (D.D.C.2005), the court concluded that the DCHRA "provides for individual liability" and refused to dismiss the complaint against two individual employees of a nonprofit corporation, the Executive Director and the Vice President of Advocacy and Research. *Id.* at 225, 228.[7]

---

**6.** *Mitchell* noted that one of the cases on which the individual defendants had relied, and which Mr. Purcell here claims precludes his individual liability, *Hunter v. Ark Rests. Corp.,* 3 F.Supp.2d 9 (D.D.C.1998), was decided before *Wallace, supra.*

**7.** In response to a motion for reconsideration in *MacIntosh,* the court reiterated that the

Executive Director and corporate vice president could be sued individually under part of the definition of "employer" in the DCHRA— "any person acting in the interest of [the] employer, directly or indirectly." *See also Lance v. United Mine Workers of Am.1974 Pension Trust,* 400 F.Supp.2d 29 (D.D.C.2005).

Other jurisdictions have imposed individual liability upon management and supervisory employees under state law in employment discrimination cases. *See*, *e.g.*, *Brown v. Scott Paper Worldwide Co.*, 143 Wash.2d 349, 20 P.3d 921, 928 (2001) ("We hold individual supervisors, along with their employers, may be held liable for their discriminatory acts. The plain meaning of [Revised Code of Washington] 49.60.040(3), by its very terms, encompasses individual supervisors and managers who discriminate in employment."); *Vivian v. Madison*, 601 N.W.2d 872, 878 (Iowa 1999) ("[W]e hold that a supervisory employee is subject to individual liability for unfair labor practices under Iowa Code section 216.6(1) of the Iowa Civil Rights Act.").

Mr. Purcell leans heavily on *Lenhardt v. Basic Inst. of Tech., Inc.*, 55 F.3d 377 (8th Cir.1995), a federal case which followed precedents interpreting Title VII's definition of "employer" to declare its belief that "the Missouri Supreme Court would hold that the definition of the term employer in the MHRA [Missouri Human Rights Act] does not subject employees, including supervisors or managers, to individual liability." *Id.* at 381. But *Lenhardt* has been questioned and criticized by other jurisdictions. Most notably, the Court of Appeals of Missouri, which first considered the issue of individual liability under the MHRA, categorically rejected the Eighth Circuit's view of its law in declaring: "We find that the plain and unambiguous language within the definition of 'employer' under the MHRA imposes individual liability in the event of discriminatory conduct." *Cooper v. Albacore Holdings, Inc.*, 204 S.W.3d 238, 244 (Mo.App.2006). Thus, the court affirmed a judgment finding the Chief Executive Officer of the employer individually liable in a sexual harassment claim under the MHRA. *Id.* ("[T]he CEO of Employer [ ] falls within the definition of 'employer' under the MHRA."). The Missouri Court of Appeals also rejected *Lenhardt* in affirming an age discrimination judgment against the Athletic Director and the Vice Chancellor for Administrative Affairs of the University of Missouri at St. Louis, declaring that "as [plaintiff's] supervisors, ... [they] fall within the definition of 'employer' under the MHRA [and] ... may be found individually liable for age discrimination...." *Brady v. The Curators of the Univ. of Missouri*, 213 S.W.3d 101, 113 (Mo.App.2006). *See also Rose v. Wooten*, No. 06–4141–CV–C–WAK, 2006 WL 3511507, *1 (D.W.D.Mo.2006), 2006 U.S. Dist. LEXIS 87836, at *3 ("Federal cases in this district have also called into question the continuing validity of *Lenhardt*, and have permitted claims to proceed against individual employees ....") (citations omitted).

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.[8]

8. We are unpersuaded by appellants' remaining arguments. Appellants assert that the trial court erred by admitting the testimony of Dr. Mallet and Dr. Green and that even if the "testimony met the Court's standard for admissibility ... [it] unfairly prejudiced Appellants." The record shows that the trial court carefully considered defendants' hearsay objections, sustained some of them, and appropriately limited what could be introduced under the state of mind exception. Even assuming, without deciding, that the trial court erred in admitting portions of the testimony, we are satisfied that "the error did not influence the jury, or had but slight effect," and that "the judgment was not substantially swayed by the error" and that it did not affect appellants' "substantial rights." *R & G Orthopedic Appliances & Prosthetics, Inc. v. Curtin*, 596 A.2d 530, 539 (D.C.1991) (quoting *Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

Steven ROBINSON, Appellant,

v.

UNITED STATES, Appellee.

No. 03–CF–1180.

District of Columbia Court of Appeals.

Argued April 7, 2006.

Decided July 26, 2007.

Appellants complain that the trial court committed prejudicial error by allowing testimony concerning alleged post-termination of employment events such as that relating to Ms. Butler's and Ms. Brooks's trips to Fedora to pick up checks for Ms. Thomas, and their encounter with Mr. Purcell, as well as part of Rev. Fenwick's testimony that focused on the alleged post-employment period. They contend that this testimony related to "conduct that is not actionable sexual harassment as a matter of law." However, Mr. Purcell himself testified that he extended Ms. Thomas' time on the payroll through December 1999, and there was testimony that he initiated contact with Ms. Thomas during this period and continued his sexual harassment of her, indicating the relevance of this evidence. "The trial court is entrusted with a large measure of discretion to control the introduction of evidence." *Moore v. United States*, 757 A.2d 78, 85 (D.C.2000) (citation and internal quotation marks omitted). And, "[a] ruling on the relevance of evidence rests within the sound discretion of the trial court, and will not be disturbed absent a showing of an abuse of discretion." *In re Je. A.*, 793 A.2d 447, 449 (D.C.2002) (citation omitted). We see no abuse of discretion in the admission of the testimony about which appellants complain.

Appellants argue that the trial court's exclusion of the testimony of Robert Yancey "unfairly prejudiced [them] and denied them a fair trial." According to counsel for defendants, Dr. Yancey was "prepared to testify about the prescription medication that he prescribed for [Ms. Thomas] and that she described certain conditions and reasons for requesting it. And that goes to the possible alternative cause of the emotional distress...." The trial court excluded the testimony because, rather than impeachment evidence, Dr. Yancey's testimony would have been substantive evidence, and Mr. Yancey was not included in appellants' witness list. We see no reason to disturb the trial court's ruling. *See Drs. Groover, Christie & Merritt v. Burke*, 917 A.2d 1110, 1115 (D.C.2007); *Gubbins v. Hurson*, 885 A.2d 269, 276–77 (D.C. 2005).

Appellants contend that the trial court allowed Ms. Thomas to testify about a lost opportunity to purchase a condominium and that "[i]t is ... likely that [that testimony] improperly influenced the jury's calculation of damages." The relevant transcript reveals that appellants made no objection immediately after Ms. Thomas testified that she was having difficulty finding employment so that she could remain in her condominium unit by obtaining a $235,000 loan to purchase it. The objections came when Ms. Thomas was about to say what the loan officer told her and also as she was poised to state that the price of the unit at the time of trial would have been $391,000. The trial court observed that no "motions objecting to ... the measure of damages" had been filed. Moreover, the jury verdict form does not provide any clue as to how the jury calculated the damages since the jury was only asked to "state the amount of damages you award to Marva Thomas." On this record we cannot say that Ms. Thomas's testimony as to the $391,000 value of a condominium unit influenced the jury to award her $165,000.00 in damages.

Finally, appellants claim that they are entitled to a new trial because "Juror 1, who was elected the jury's foreman, allowed a predeposed (sic) bias to infect his and other jurors' deliberations," since the juror stated during a post-verdict conversation with defense counsel that "[w]e all know that sexual harassment happens, even when the plaintiff can't prove it." Appellants presented no affidavit to the trial court from Juror 1 or regarding Juror 1's alleged statement. In addition, "[a]s a general rule, a party cannot impeach a jury verdict by evidence given by the jurors." *Posner v. Holmes*, 739 A.2d 358, 364 (D.C. 1999) (internal quotation marks and citation omitted); *see also Bellamy v. United States*, 810 A.2d 401, 409 (D.C.2002) ("we have often warned trial judges to exercise great caution in allowing jurors to impeach their own verdicts") (citations omitted). Furthermore, we have said that "the determination of juror bias or prejudice lies particularly within the discretion of the trial court, reversible only for a clear abuse of discretion...." *Id.* at 408 (citations omitted). On this record, we cannot say that the trial court abused its discretion in denying appellants a new trial based upon the alleged post-verdict statement of Juror 1.